DAVIS, Judge.
 

 *2
 
 During the four-year marriage of Joshua and Jessica Bradley, they lived-at various times-in England, Australia, New Jersey, and New York. However, they were married in North Carolina, and over the course of their marriage Joshua engaged in various acts to maintain his ties with this state. The sole issue in this appeal arising from Jessica's divorce action is whether the trial court correctly concluded that North Carolina possessed personal jurisdiction over Joshua. Because we conclude that Joshua had sufficient minimum contacts with North Carolina such that the exercise of jurisdiction over him by a North Carolina court is consistent with principles of due process, we affirm the trial court's order denying Joshua's motion to dismiss pursuant to Rule 12(b)(2) of the North Carolina Rules of Civil Procedure.
 

 Factual and Procedural Background
 

 Joshua was born and raised in Virginia. Jessica is from North Carolina. The parties first met in Virginia while Jessica was in graduate school and Joshua was in law school. After Jessica completed her schooling in Virginia, she returned to North Carolina to complete her Master's Degree. She was living in North Carolina with her parents (the "Vanns") in Bladen County at the time that she and Joshua married.
 

 Upon Joshua's graduation from the University of Virginia School of Law in 2009, he was admitted to the New York bar and began working at a law firm in New York City. As part of his employment with the firm, he was sent to work on temporary assignments in various locations. At the time the couple married, Joshua was on a temporary assignment to Sydney, Australia.
 

 Jessica and Joshua had two wedding ceremonies-both of which took place in Bladen County. The first was a "legal marriage ceremony" in March 2011, and the second was a "formal" ceremony in August 2011. For each ceremony, Joshua flew to North Carolina for a few days and then returned to Australia.
 

 The parties lived in Australia as a married couple from September 2011 until July 2013. In July 2013, Joshua was recalled by his employer to the firm's New York office. The parties resided in New York for two months and then moved to New Jersey in October 2013 where they leased real property and lived for nine months.
 

 In May or June 2014, Joshua received another temporary assignment to work in London, England. The parties moved to London and lived
 
 *3
 
 there from July 2014 until June 2015. Because they were moving abroad, they decided to store various items of their personal property in a storage unit. Joshua contacted Jessica's father, Jesse Vann ("Mr. Vann"), and asked him to rent a storage unit in Fayetteville, North Carolina for this purpose. Mr. Vann agreed to do so and rented the storage unit in his own name. Joshua proceeded to ship various property-including marital property of the parties-to Mr. Vann, which he placed in the storage unit in Fayetteville. Joshua continuously paid the fees associated with the storage unit for the next 23 months.
 

 While the parties were living abroad, Joshua arranged for a portion of their mail to be sent to the Vanns' home in North Carolina, and they also received additional mail at his
 
 *61
 
 parents' home in Virginia and at his employer's address in New York. Among the items of mail he received at the Vanns' home were certain "boxed shipments."
 

 In May 2014, the parties learned that Jessica was pregnant. During the pregnancy, the parties had two baby showers in the United States-one in Bladen County, North Carolina and one in Virginia. The parties' child, Eden, was born on 1 February 2015 in London, England.
 

 In May 2015, the parties agreed that they would live apart for a period of time. The family flew to Virginia where Jessica and Eden began living with Joshua's parents.
 

 In June 2015, Joshua and Jessica officially decided to separate. Jessica and Eden moved from Joshua's parents' home in Virginia to live with her parents in Bladen County. At the time this action commenced, Jessica was living in North Carolina with Eden, and Joshua was still living in London.
 

 On 1 March 2016, Jessica filed a complaint in New Hanover County District Court seeking child custody, child support, post-separation support, alimony, equitable distribution, and attorneys' fees. On 1 April 2016, Joshua filed a motion to dismiss pursuant to Rule 12(b)(2) of the North Carolina Rules of Civil Procedure, asserting that the trial court lacked personal jurisdiction over him. On 14 April 2016, he filed an affidavit in support of his motion. Four days later, he filed an amended motion to dismiss.
 

 A hearing was held on Joshua's amended motion to dismiss on 15 June 2016 before the Honorable Jeffrey Evan Noecker. Prior to the hearing, Joshua filed a second affidavit. On 13 July 2016, the trial court entered an order denying Joshua's amended motion to dismiss and concluding that it possessed personal jurisdiction over Joshua. Joshua filed a timely notice of appeal.
 

 *4
 

 Analysis
 

 I. Appellate Jurisdiction
 

 As an initial matter, we must determine whether we have appellate jurisdiction to hear Joshua's appeal.
 
 See
 

 Duval v. OM Hospitality, LLC
 
 ,
 
 186 N.C. App. 390
 
 , 392,
 
 651 S.E.2d 261
 
 , 263 (2007) ("[W]hether an appeal is interlocutory presents a jurisdictional issue, and this Court has an obligation to address the issue
 
 sua sponte
 
 ." (citation, quotation marks, and brackets omitted)). "A final judgment is one which disposes of the cause as to all the parties, leaving nothing to be judicially determined between them in the trial court."
 

 Id.
 

 (citation omitted). Conversely, an order or judgment is interlocutory if it does not settle all of the issues in the case but rather "directs some further proceeding preliminary to the final decree."
 
 Heavner v. Heavner
 
 ,
 
 73 N.C. App. 331
 
 , 332,
 
 326 S.E.2d 78
 
 , 80,
 
 disc. review denied
 
 ,
 
 313 N.C. 601
 
 ,
 
 330 S.E.2d 610
 
 (1985).
 

 "Generally, there is no right of immediate appeal from interlocutory orders and judgments."
 
 Paradigm Consultants, Ltd. v. Builders Mut. Ins. Co.
 
 ,
 
 228 N.C. App. 314
 
 , 317,
 
 745 S.E.2d 69
 
 , 72 (2013) (citation and quotation marks omitted). The prohibition against interlocutory appeals "prevents fragmentary, premature and unnecessary appeals by permitting the trial court to bring the case to final judgment before it is presented to the appellate courts."
 
 Russell v. State Farm Ins. Co.
 
 ,
 
 136 N.C. App. 798
 
 , 800,
 
 526 S.E.2d 494
 
 , 496 (2000) (citation and brackets omitted).
 

 However, "[a]ny interested party shall have the right of immediate appeal from an adverse ruling as to the jurisdiction of the court over the person or property of the defendant...."
 
 N.C. Gen. Stat. § 1-277
 
 (b) (2015). Thus, Joshua has a right of immediate appeal.
 
 See
 

 Meherrin Indian Tribe v. Lewis
 
 ,
 
 197 N.C. App. 380
 
 , 384,
 
 677 S.E.2d 203
 
 , 207 (2009) (holding that "
 
 N.C. Gen. Stat. § 1-277
 
 (b) allows ... for an immediate appeal of the denial of a motion to dismiss based on personal jurisdiction"),
 
 disc. review denied
 
 ,
 
 363 N.C. 806
 
 ,
 
 690 S.E.2d 705
 
 (2010).
 

 II. Personal Jurisdiction
 

 Joshua contends that the trial court erred in denying his motion to dismiss under Rule 12(b)(2) as to Jessica's claims for child support, post-separation support, alimony,
 
 *62
 
 and equitable distribution.
 
 [1]
 
 "The standard
 
 *5
 
 of review of an order determining personal jurisdiction is whether the findings of fact by the trial court are supported by competent evidence in the record."
 
 Bell v. Mozley
 
 ,
 
 216 N.C. App. 540
 
 , 543,
 
 716 S.E.2d 868
 
 , 871 (2011) (citation, quotation marks, and brackets omitted),
 
 disc. review denied
 
 , --- N.C. ----,
 
 724 S.E.2d 529
 
 (2012). We have held that "[t]he trial court's determination regarding the existence of grounds for personal jurisdiction is a question of fact."
 
 Eluhu v. Rosenhaus
 
 ,
 
 159 N.C. App. 355
 
 , 357,
 
 583 S.E.2d 707
 
 , 710 (2003),
 
 aff'd per curiam
 
 ,
 
 358 N.C. 372
 
 ,
 
 595 S.E.2d 146
 
 (2004).
 

 The determination of whether the trial court can properly exercise personal jurisdiction over a non-resident defendant is a two-part inquiry. First, the North Carolina long-arm statute must permit the exercise of personal jurisdiction. Second, the exercise of personal jurisdiction must comport with the due process clause of the Fourteenth Amendment of the United States Constitution.
 

 Filmar Racing, Inc. v. Stewart
 
 ,
 
 141 N.C. App. 668
 
 , 671,
 
 541 S.E.2d 733
 
 , 736 (2001) (internal citations and quotation marks omitted).
 
 [2]
 

 "In order to determine whether the exercise of personal jurisdiction comports with due process, the trial court must evaluate whether the defendant has certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."
 
 Eluhu
 
 ,
 
 159 N.C. App. at 358
 
 ,
 
 583 S.E.2d at 710
 
 (2003) (citation, quotation marks, and brackets omitted). "The relationship between the defendant and the forum state must be such that the defendant should reasonably anticipate being haled into a North Carolina court."
 
 Bell
 
 ,
 
 216 N.C. App. at 544
 
 ,
 
 716 S.E.2d at 872
 
 (citation and quotation marks omitted).
 

 Factors for determining existence of minimum contacts include (1) quantity of the contacts, (2) nature and quality of the contacts, (3) the source and connection of the cause of action to the contacts, (4) the interest of the forum state, and (5) convenience to the parties.
 

 Bruggeman v. Meditrust Acquisition Co.
 
 ,
 
 138 N.C. App. 612
 
 , 617,
 
 532 S.E.2d 215
 
 , 219 (citation and quotation marks omitted),
 
 appeal dismissed and disc. review denied
 
 ,
 
 353 N.C. 261
 
 ,
 
 546 S.E.2d 90
 
 (2000).
 

 *6
 
 "The Court must also weigh and consider the interests of and fairness to the parties involved in the litigation."
 
 Sherlock v. Sherlock
 
 ,
 
 143 N.C. App. 300
 
 , 304,
 
 545 S.E.2d 757
 
 , 761 (2001) (citation omitted). However, as the United States Supreme Court has stated:
 

 [T]he Due Process Clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations. Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.
 

 World-Wide Volkswagen Corp. v. Woodson
 
 ,
 
 444 U.S. 286
 
 , 294,
 
 100 S.Ct. 559
 
 , 565-66,
 
 62 L.Ed.2d 490
 
 , 499-500 (1980).
 

 As an initial matter, we note that the United States Supreme Court has held the mere fact that a defendant's wedding ceremony took place in a particular state does not-by itself-establish personal jurisdiction over him by the courts of that state.
 
 See
 

 *63
 

 Kulko v. Superior Court of Cal.
 
 ,
 
 436 U.S. 84
 
 , 93,
 
 98 S.Ct. 1690
 
 , 1697-98,
 
 56 L.Ed.2d 132
 
 , 142 (1978) ("[W]here two New York domiciliaries, for reasons of convenience, marry in the State of California and thereafter spend their entire married life in New York, the fact of their California marriage by itself cannot support a California court's exercise of jurisdiction over a spouse who remains a New York resident....");
 
 see also
 

 Southern v. Southern
 
 ,
 
 43 N.C. App. 159
 
 , 163,
 
 258 S.E.2d 422
 
 , 425 (1979) (citing
 
 Kulko
 
 for proposition that England lacked personal jurisdiction over defendant despite fact that parties were married in London because there was "no indication in the record that England was the parties' matrimonial domicile or that there were any contacts other than the marriage itself sufficient to justify imposing upon defendant the burden of defending suit in England").
 

 Therefore, in order for North Carolina's courts to exercise jurisdiction over Joshua, he must have had sufficient contacts with North Carolina to satisfy due process standards. Before analyzing the trial court's findings in its 13 July 2016 order, we find it instructive to review prior case law from our appellate courts on this subject.
 

 *7
 

 A. Cases Where No Personal Jurisdiction Existed
 

 In
 
 Miller v. Kite
 
 ,
 
 313 N.C. 474
 
 ,
 
 329 S.E.2d 663
 
 (1985), the parties were married in Illinois, but after four years of marriage they separated. The plaintiff took custody of their young daughter and moved to North Carolina. For ten years, the defendant mailed child support payments to the plaintiff and visited the child in North Carolina.
 
 Id.
 
 at 478,
 
 329 S.E.2d at 665
 
 . When the defendant stopped payments after ten years, the plaintiff sued him for child support in North Carolina while he was living in Tokyo, Japan. The defendant moved to dismiss the complaint, arguing that the court did not have personal jurisdiction over him. The trial court denied the motion.
 

 Id.
 

 On appeal, our Supreme Court held that the trial court had erred in denying the defendant's motion to dismiss.
 
 Id.
 
 at 478,
 
 329 S.E.2d at 666
 
 . The Court ruled that "the defendant ha[d] engaged in no acts with respect to North Carolina by which he ha[d] purposefully availed himself of the benefits, protections and privileges of the laws of this State."
 
 Id.
 
 at 480-81,
 
 329 S.E.2d at 667
 
 .
 

 In the instant case the child's presence in North Carolina was not caused by the defendant's acquiescence. Instead, it was solely the result of the plaintiff's decision as the custodial parent to live here with the child. As previously noted, the Supreme Court has expressly stated that unilateral acts by the party claiming a relationship with a non-resident defendant may not, without more, satisfy due process requirements.
 
 Hanson v. Denckla
 
 ,
 
 357 U.S. 235
 
 , 253,
 
 78 S.Ct. 1228
 
 ,
 
 2 L.Ed.2d 1283
 
 (1958). We conclude that
 
 Kulko
 
 compels a finding that this defendant did not purposefully avail himself of the benefits and protections of the laws of this State. A contrary conclusion would discourage voluntary child custody agreements and subject a non-custodial parent to suit in any jurisdiction where the custodial parent chose to reside.
 
 See
 

 Kulko v. Superior Court of California
 
 ,
 
 436 U.S. 84
 
 , 93,
 
 98 S.Ct. 1690
 
 ,
 
 56 L.Ed.2d 132
 
 (1978).
 

 Id.
 
 at 479,
 
 329 S.E.2d at 666
 
 .
 

 The Court also determined that the defendant's six visits over ten years to North Carolina to visit the child were insufficient to confer jurisdiction over him.
 

 Id.
 

 In comparing the case to
 
 Kulko
 
 , the Court observed that
 

 *8
 
 [t]he father's visits to California in
 
 Kulko
 
 were fewer and more distant in time from the litigation than were the visits in this case. The visits by this defendant to North Carolina, however, were no less temporary than those in
 
 Kulko
 
 and were so unrelated to this action that he could not have reasonably anticipated being subjected to suit here.
 

 Id.
 
 at 480,
 
 329 S.E.2d at 667
 
 .
 

 Finally, the Supreme Court acknowledged that "the presence of the child and one parent in North Carolina might make this State the most convenient forum for the action."
 

 Id.
 

 However, the Court ruled that this fact alone "does not confer personal jurisdiction
 
 *64
 
 over a non-resident defendant."
 

 Id.
 

 (citation omitted). The Court stated that it was "mindful that North Carolina has an important interest in ensuring that non-resident parents fulfill their support obligations to their children living here[,]" but that "[a]bsent the constitutionally required minimum contacts ... this interest will not suffice to make North Carolina a proper forum in which to require the defendant to defend the action...."
 

 Id.
 

 (citation omitted).
 

 In
 
 Carroll v. Carroll
 
 ,
 
 88 N.C. App. 453
 
 ,
 
 363 S.E.2d 872
 
 (1988), the plaintiff and defendant were married in Washington and owned real and personal property in that state. After the parties separated, the plaintiff moved to North Carolina.
 
 Id.
 
 at 455,
 
 363 S.E.2d at 874
 
 . The plaintiff subsequently filed a complaint in North Carolina for divorce, child custody, child support, and equitable distribution.
 
 Id.
 
 at 453,
 
 363 S.E.2d at 872-73
 
 . In determining that it possessed personal jurisdiction over the defendant, the trial court took into consideration the fact that "certain property of the parties was located in North Carolina."
 
 Id.
 
 at 455,
 
 363 S.E.2d at 874
 
 .
 

 On appeal, we held that the trial court lacked personal jurisdiction over the defendant because he had never lived in North Carolina and the record did not specify whether he had consented to his personal property being brought into North Carolina.
 
 Id.
 
 at 456,
 
 363 S.E.2d at 874
 
 . In so holding, we stated that
 

 [t]he fact that there exists some personal property in North Carolina in which the defendant may have an interest because of the equitable distribution statutes is not alone sufficient to establish jurisdiction over the defendant or his property. If there was evidence the defendant brought the property into North Carolina or consented to the placement of property in North Carolina, this would be
 
 *9
 
 some evidence of contacts with the forum State, the defendant and the litigation. This however, would not itself necessarily be decisive concerning the issue of jurisdiction.
 

 Id.
 

 (internal citations omitted).
 

 Tompkins v. Tompkins
 
 ,
 
 98 N.C. App. 299
 
 ,
 
 390 S.E.2d 766
 
 (1990), involved a suit by the plaintiff against the defendant in North Carolina seeking alimony and equitable distribution, alleging that the defendant had committed adultery during the marriage. The defendant filed a motion to dismiss for lack of personal jurisdiction, asserting that the complaint contained no evidence that the parties were married in North Carolina, that he was living in the state, or that the misconduct had occurred in the state.
 
 Id.
 
 at 302,
 
 390 S.E.2d at 768
 
 . Moreover, the defendant argued that he had
 

 left the State of North Carolina more than three and one-half years prior to the commencement of this action, had resided in South Carolina since that time, owned no property in North Carolina, conducted no business in this State, and had not invoked the protection of North Carolina law for any purpose or reason since leaving this State.
 

 Id.
 
 at 300,
 
 390 S.E.2d at 767
 
 . The plaintiff, in turn, contended that because the defendant had "abandoned" her in North Carolina while they were legally married, he had sufficient contacts with the state.
 
 Id.
 
 at 304,
 
 390 S.E.2d at 769
 
 .
 

 The trial court dismissed the plaintiff's complaint, and we affirmed, stating that
 

 plaintiff's allegations of defendant's marital misconduct, absent any allegations going to a nexus between such misconduct and this State, are simply insufficient to permit the reasonable inference that personal jurisdiction over defendant could properly be acquired in this case.... [T]he mere fact that the marriage is still in existence at the time an action for alimony is initiated cannot of itself constitute sufficient contacts to establish personal jurisdiction over a foreign defendant. Were it otherwise, this State could exercise personal jurisdiction over a foreign defendant solely by virtue of a plaintiff's unilateral act of moving to North Carolina prior to the termination of the marriage. This is plainly impermissible.
 

 Id.
 
 at 304,
 
 390 S.E.2d at 769-70
 
 (citations omitted).
 

 *10
 
 In
 
 Shamley v. Shamley
 
 ,
 
 117 N.C. App. 175
 
 ,
 
 455 S.E.2d 435
 
 (1994), the plaintiff and defendant were married in New York. After twenty years of living in New Jersey, the
 
 *65
 
 plaintiff began looking to buy houses, and eventually he bought a home in North Carolina.
 
 Id.
 
 at 176-77,
 
 455 S.E.2d at 436
 
 . The defendant accompanied him to North Carolina, but she did not take part in purchasing the house.
 
 Id.
 
 at 181,
 
 455 S.E.2d at 438
 
 . While she was in North Carolina during another visit, the defendant purchased an automobile, which she later had titled in New Jersey.
 

 Id.
 

 Upon the parties' separation, the plaintiff sued for absolute divorce and equitable distribution in North Carolina, and the defendant brought a similar suit in New Jersey.
 
 Id.
 
 at 177,
 
 455 S.E.2d at 436
 
 . The trial court determined that it did not have personal jurisdiction over the defendant and dismissed the case.
 
 Id.
 
 at 177-78,
 
 455 S.E.2d at 436
 
 .
 

 On appeal, we affirmed, holding that the defendant's "only voluntary contacts with North Carolina were during a brief visit in which she looked at houses with [plaintiff] and another visit in which she purchased an automobile...."
 
 Id.
 
 at 182,
 
 455 S.E.2d at 439
 
 . We concluded that she "could not, on the basis of these contacts, reasonably anticipate being haled into court here."
 

 Id.
 

 Finally,
 
 Shaner v. Shaner
 
 ,
 
 216 N.C. App. 409
 
 ,
 
 717 S.E.2d 66
 
 (2011), involved parties who were married in New York and lived together as husband and wife for 41 years.
 
 Id.
 
 at 409,
 
 717 S.E.2d at 67
 
 . Five years prior to their divorce, the couple moved to Mooresville, North Carolina to live near their adult children.
 

 Id.
 

 However, after four months, the defendant returned to live in the couple's New York home.
 
 Id.
 
 at 409,
 
 717 S.E.2d at 67-68
 
 . The plaintiff subsequently purchased a home in Statesville, North Carolina.
 
 Id.
 
 at 409,
 
 717 S.E.2d at 68
 
 . She spent the final three years of the marriage living at times in New York with the defendant and at other times in North Carolina near her children, whom the defendant also briefly visited.
 

 Id.
 

 Upon the parties' separation, the plaintiff filed a complaint for post-separation support, alimony, absolute divorce, and equitable distribution in North Carolina.
 

 Id.
 

 The defendant moved to dismiss the action, and the trial court denied his motion, concluding that it possessed personal jurisdiction over him.
 
 Id.
 
 at 409-10,
 
 717 S.E.2d at 68
 
 .
 

 On appeal, we determined that the defendant's "limited contacts with North Carolina"-including the four months that he lived in North Carolina with the plaintiff-were "analogous to those in
 
 Shamley
 
 ...."
 
 Id.
 
 at 412,
 
 717 S.E.2d at 69
 
 . We concluded that "[b]ecause Defendant could not reasonably anticipate being haled into court on the basis of these contacts, the trial court's exercise of personal jurisdiction over Defendant would violate his due process rights."
 

 Id.
 

 *11
 

 B. Cases Where Personal Jurisdiction Was Found to Exist
 

 In
 
 Holt v. Holt
 
 ,
 
 41 N.C. App. 344
 
 ,
 
 255 S.E.2d 407
 
 (1979), the plaintiff was living in Missouri and the defendant in Alabama when the plaintiff filed suit in North Carolina for alimony and child support. She argued that jurisdiction existed over the defendant because he "own[ed] real property in North Carolina which could be used to satisfy the divorce judgment."
 
 Id.
 
 at 345,
 
 255 S.E.2d at 412
 
 . The trial court found that personal jurisdiction existed because the parties had jointly purchased a house in Montreat, North Carolina.
 
 Id.
 
 at 353,
 
 255 S.E.2d at 413
 
 .
 

 On appeal, we affirmed, holding that because the defendant was making payments on the house but not paying the plaintiff spousal and child support "the North Carolina property [wa]s certainly a part of the source of the underlying controversy between the plaintiff and the defendant."
 

 Id.
 

 (quotation marks omitted). Thus, we reasoned that
 

 not allowing plaintiff to obtain jurisdiction over defendant (who left the state of his domicil[e] less than one month after being ordered to make such payments to his wife and children, purchased real estate in North Carolina and incurred financial obligations as a result thereof) could clearly result in defendant being allowed to avoid the court ordered payments by purchasing North Carolina real estate.... Clearly, the cause of action here was a direct and foreseeable outgrowth of defendant's contacts with this state.
 

 Id.
 
 at 354,
 
 255 S.E.2d at 413
 
 .
 

 In
 
 Harris v. Harris
 
 ,
 
 104 N.C. App. 574
 
 , 581,
 
 410 S.E.2d 527
 
 , 532 (1991), the defendant
 
 *66
 
 was born in Virginia but attended public schools and universities in North Carolina.
 

 Id.
 

 at 575
 
 ,
 
 410 S.E.2d at 528
 
 . He and the plaintiff were married in North Carolina and established a marital residence in this State for three years during which time their first child was born.
 

 Id.
 

 For the remainder of their eighteen-year marriage, the parties lived in Virginia, although they returned to visit family members in North Carolina during that time. Even after moving to Virginia, the defendant-who owned a dog training business-maintained business contacts with dog trainers, sellers, and purchasers in North Carolina, traveling to the state "at least once a year to participate in dog training exercises or dog shows and competitions."
 

 Id.
 

 at 576
 
 ,
 
 410 S.E.2d at 529
 
 . Upon the parties' divorce, the plaintiff and one of the parties' children returned to live in North Carolina.
 

 Id.
 

 *12
 
 The plaintiff filed an action for child support, and the defendant moved to dismiss the complaint for lack of personal jurisdiction.
 

 Id.
 

 at 576
 
 ,
 
 410 S.E.2d at 529
 
 . The trial court concluded that personal jurisdiction existed over the defendant.
 

 Id.
 

 Observing that "the defendant has substantial past and present contacts with North Carolina[,]" this Court affirmed the trial court's order, stating as follows:
 

 The defendant moved to North Carolina at an early age and lived here until 1974. He and the plaintiff were married here in 1971, had a child here in 1973, and resided in North Carolina as husband and wife for nearly three years before moving to Virginia. While in Virginia, they maintained contacts with family members in North Carolina, visiting them during the various holidays. In 1989, the parties separated and the plaintiff returned to North Carolina with their third child and was joined later by their second child. Since the parties' separation, the defendant has maintained his contacts with family members in this State, visiting them on at least two occasions. Furthermore, the defendant has established and maintained business contacts in North Carolina and has travelled routinely to this State to participate in business-related activities. Viewed in light of North Carolina's important interest in ensuring that non-resident parents fulfill their support obligations to their children living here, the quantity, nature, and quality of the defendant's past and present contacts with North Carolina support a finding of "minimum contacts" and therefore support the exercise of personal jurisdiction over him in our courts, probably the most convenient forum for this action.
 

 Id.
 

 at 581-82
 
 ,
 
 410 S.E.2d at 532
 
 (internal citations and quotation marks omitted).
 

 Bates v. Jarrett
 
 ,
 
 135 N.C. App. 594
 
 ,
 
 521 S.E.2d 735
 
 (1999), involved a wife and husband who were married and lived in North Carolina for nearly eight years.
 
 Id.
 
 at 600,
 
 521 S.E.2d at 739
 
 . Upon their divorce, the husband moved out of the state. The wife sought a domestic violence protective order in Cumberland County, North Carolina but failed to serve the husband. Nevertheless, the husband made an appearance at a domestic violence hearing.
 
 Id.
 
 at 600-01,
 
 521 S.E.2d at 739
 
 .
 

 *13
 
 Upon the couple's separation, the husband allowed the wife to bring the couple's Subaru into North Carolina, but then-without the wife's consent-he sold the car and conveyed the title to another couple who was living in North Carolina.
 

 Id.
 

 The couple who bought the Subaru were involved in a motor vehicle accident while driving the vehicle, and the insurance proceeds were paid to them.
 

 Id.
 

 The wife filed suit against both the Subaru's purchasers and her husband, contending that she had not consented to the sale of the vehicle.
 
 Id.
 
 at 601,
 
 521 S.E.2d at 739
 
 . In the same lawsuit, she also filed an equitable distribution claim against her husband.
 
 Id.
 
 at 595,
 
 521 S.E.2d at 736
 
 . The husband moved to dismiss the claim against him, arguing that the trial court did not possess personal jurisdiction over him. The trial court concluded that it lacked personal jurisdiction over the husband.
 
 Id.
 
 at 596,
 
 521 S.E.2d at 736
 
 .
 

 On appeal, we held that personal jurisdiction existed over the husband. In so holding, we observed that the marital couple had "resided in this State from 1985 until 1992 or 1993" and that the husband had "consented to [the wife] bringing the Subaru to this
 
 *67
 
 State."
 
 Id.
 
 at 600,
 
 521 S.E.2d at 739
 
 . Moreover, we noted that the husband "had additional contact with the State. He appeared at the domestic violence hearing without being served with process."
 
 Id.
 
 at 600,
 
 521 S.E.2d at 739
 
 . Finally, we reasoned that "the actions of [the husband] ... involving the Subaru constitute sufficient minimum contacts with the State such that he should have reasonably anticipated being haled into Court here over the issues of possession and ownership of this vehicle."
 
 Id.
 
 at 601,
 
 521 S.E.2d at 739
 
 .
 

 In
 
 Lang v. Lang
 
 ,
 
 157 N.C. App. 703
 
 ,
 
 579 S.E.2d 919
 
 (2003), the defendant and his wife were married in Germany and remained married for twelve years. One daughter-the plaintiff-was born of the marriage. After the marriage ended, the couple agreed to a separation agreement whereby the defendant would pay spousal and child support. "Sometime thereafter, defendant moved to Henderson County, North Carolina."
 
 Id.
 
 at 704,
 
 579 S.E.2d at 921
 
 . There he became involved in the "business of selling real estate in Henderson County, North Carolina" and "signed, as a seller, offers to purchase and contract for real property located in North Carolina...."
 
 Id.
 
 at 709,
 
 579 S.E.2d at 923
 
 (quotation marks omitted). At that time, the plaintiff and her mother both sought support orders in North Carolina based upon the defendant's actions in choosing to live and conduct business activities within the state.
 

 Id.
 

 Thirty years after the separation agreement was executed, the plaintiff filed another suit against the defendant in North Carolina to enforce
 
 *14
 
 the support judgment she had previously secured against him.
 
 Id.
 
 at 704,
 
 579 S.E.2d at 920-21
 
 . The defendant argued that the trial court did not have jurisdiction over him because he "was never a resident or citizen of the State[,]" but the court denied his motion.
 
 Id.
 
 at 704-05,
 
 579 S.E.2d at 921
 
 . The trial court found, in pertinent part, that the defendant had been "issued a North Carolina operator's license[,]" had owned a subdivision in Henderson County, North Carolina for ten years and was present in the subdivision "hundreds of times[;]" had been showing homes in the subdivision and "taking back mortgages to assist with the financing[;]" and had purchased and registered a new automobile in North Carolina.
 
 Id.
 
 at 705-06,
 
 579 S.E.2d at 921
 
 (quotation marks omitted).
 

 This Court held that the evidence of the defendant's business activities supported the trial court's finding that his contacts in North Carolina were "continuous and systematic[.]"
 
 Id.
 
 at 709,
 
 579 S.E.2d at 923
 
 . We concluded that these contacts were "sufficient to support the conclusion that defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws and could therefore reasonably anticipate being haled into court in North Carolina."
 

 Id.
 

 (citation, quotation marks, and brackets omitted).
 

 In
 
 Butler v. Butler
 
 ,
 
 152 N.C. App. 74
 
 ,
 
 566 S.E.2d 707
 
 (2002), the parties were married in Florida and lived in the Bahamas during the first four years of their marriage. After five years of marriage, the couple purchased a house together in Moore County, North Carolina where the plaintiff and the couple's daughters lived for the remaining four years of the marriage.
 
 Id.
 
 at 75,
 
 566 S.E.2d at 708
 
 . The defendant continued living in the Bahamas but visited his family in North Carolina. In addition, he maintained a membership with the "Moore County Hounds, a social and sporting association and ha[d] participated in its activities in Moore County."
 
 Id.
 
 at 77,
 
 566 S.E.2d at 709
 
 (brackets omitted). When the parties separated, the plaintiff sued in North Carolina for child support, alimony, post-separation support, and equitable distribution.
 
 Id.
 
 at 75-76,
 
 566 S.E.2d at 708
 
 . The defendant moved to dismiss under Rule 12(b)(2), but the trial court found that he had sufficient minimum contacts with North Carolina to permit the court to exercise personal jurisdiction over him.
 
 Id.
 
 at 76,
 
 566 S.E.2d at 708
 
 .
 

 We affirmed, holding as follows:
 

 Defendant's name appears on both the deed and the [Moore County] home mortgage. Defendant testified that he was convinced that North Carolina was the best place
 
 *15
 
 for his daughter and stepdaughter to receive an education. Based on this competent evidence, the trial court found as fact that one reason defendant purchased the
 
 *68
 
 house in North Carolina was to allow his daughter to be schooled here. Following their move to North Carolina, defendant visited plaintiff and the girls at least once a month for two years, staying in the house for three or more days at a time. During this period, plaintiff and defendant were still married. Thus, we agree with the trial court's characterization of the house in Moore County as a "marital residence." In addition to visiting his family in this State, defendant maintained a membership in Moore County Hounds, a social and sporting association, and participated in the association's activities in Moore County. Finally, the evidence shows that defendant further benefitted from his connections with this State by using the equity line of credit on the Moore County house for business purposes.
 

 Id.
 
 at 82,
 
 566 S.E.2d at 712
 
 . For these reasons, we determined that "the record supports the conclusion that defendant purposefully availed himself of the benefits and protections of this State's laws."
 
 Id.
 
 at 83,
 
 566 S.E.2d at 713
 
 .
 

 In the present case, Jessica relies most heavily on our decision in
 
 Sherlock
 
 . In that case, the parties were married in Durham, North Carolina but never actually lived in the state, instead living abroad for the majority of their nearly sixteen-year marriage. They "resided in Egypt, Korea, the Philippines, India, Indonesia, Australia, and Thailand[,]" and "a six month stay in Georgia was the only time during their marriage that they lived in the United States."
 
 Sherlock
 
 ,
 
 143 N.C. App. at 304
 
 ,
 
 545 S.E.2d at 761
 
 . Upon their separation, the plaintiff sued the defendant in North Carolina seeking post-separation support.
 
 Id.
 
 at 301,
 
 545 S.E.2d at 759
 
 . The trial court denied the defendant's motion to dismiss for lack of personal jurisdiction.
 

 Id.
 

 On appeal, we determined that although the defendant was "seldom physically present within the state," he had sufficient minimum contacts with North Carolina for the trial court to exercise personal jurisdiction over him.
 
 Id.
 
 at 306,
 
 545 S.E.2d at 762
 
 . In so holding, we summarized the defendant's contacts with North Carolina as follows:
 

 (1) their marriage ceremony was performed in Durham, North Carolina. Consequently, [the parties'] marriage license was filed there, and the provisions of Chapter 52,
 
 *16
 
 "Powers and Liabilities of Married Persons," governed various legal aspects of their relationship during the marriage; (2) while he was overseas, the defendant used his father-in-law's Durham address to receive important mail, including federal income tax documents; (3) between 1983 and 1989 the defendant's salary was directly deposited into a Wachovia bank account in Durham, North Carolina; (4) between 1984 and 1995 the defendant had a North Carolina drivers' license. To obtain a license, the defendant must have had at least a nominal "residence" in North Carolina; (5) in 1984, the defendant executed a Power of Attorney in Durham, and made Albert Sheehy, his father-in-law, his Attorney in Fact. This document was filed in the Durham County Registry; (6) in his capacity as Attorney in Fact, Mr. Sheehy conducted business on behalf of plaintiff and defendant while they were overseas; (7) in 1984, the defendant made a Last Will and Testament, naming Mr. Sheehy, of Durham, the executor of his will, and Mary Meschter, also of Durham, as alternate executor; (8) from 1992 to 1995 the defendant retained Frank Brown, a Durham accountant, to receive and pay bills on his behalf; and (9) in 1992, plaintiff and defendant opened an investment account with Edward D. Jones, Oxford, North Carolina, consisting of IRA accounts, money market funds, and mutual funds.
 

 Id.
 
 at 304-05,
 
 545 S.E.2d at 761
 
 .
 

 Based on these contacts, we ruled that the defendant had "availed himself to the privilege of conducting activities within North Carolina, thus invoking the benefits and protections of its laws."
 
 Id.
 
 at 305,
 
 545 S.E.2d at 762
 
 (citation, quotation marks, and brackets omitted). In so holding, we emphasized the uniqueness of the factual scenario in
 
 Sherlock
 
 :
 

 This Court recognizes that a state does not attain personal jurisdiction over a defendant simply by being the center of gravity of the controversy or the most convenient
 
 *69
 
 location for the trial of the action. In the ordinary divorce case, it might be improper to assert jurisdiction over a defendant who has spent so little time in the forum state. However, the [parties'] history is unusual; their frequent moves from one foreign country to another, and their failure to establish a permanent home anywhere in the United States or
 
 *17
 
 abroad, require this Court to evaluate their situation on its own merits.
 

 Id.
 
 at 306,
 
 545 S.E.2d at 762
 
 (internal citation and quotation marks omitted).
 

 C. Application of Case Law to Present Action
 

 In the present case, the trial court made the following pertinent findings of fact:
 

 14. Joshua took a position as an attorney with Sullivan & Cromwell, LLP, a law firm with its headquarters in New York, New York. At all times since accepting this employment in October 2010, he has continued to be employed with Sullivan & Cromwell and is presently employed with this firm. Joshua's employment dictated the location the parties resided throughout their marriage.
 

 ....
 

 16. Joshua and Jessica are Husband and Wife, having lawfully intermarried on or about 28 March 2011 in Bladen County, North Carolina. This was a legal marriage ceremony so that the parties could share one visa application as a married couple to apply for a visa to live in Australia while on temporary assignment with Sullivan & Cromwell.
 

 17. The parties' marriage application, license and certificate of marriage was [sic] filed in the Bladen County Register of Deeds.
 

 18. After the parties were legally married, Joshua flew to Sydney[,] Australia in connection with his temporary work assignment there for his employer on or about 5 May 2011. He returned to North Carolina on or about 11 August 2011 for the parties' second wedding ceremony.
 

 19. The parties had a second "formal" marriage ceremony to which friends and family were invited in Dublin, North Carolina on 14 August 2011. Both parties attended and participated in the event after which they honeymooned in Europe.
 

 *18
 
 20. With the approval of Jessica's father, Jess[e] Van[n], Joshua and Jessica used Mr. Vann's mailing address in Bladenboro, North Carolina as a home base for the receipt of mail and boxed shipments while the parties lived in Australia and then later London.
 

 21. Joshua and Jessica used Jesse Vann's mailing address with his permission in Bladenboro, North Carolina as their home base to receive mail while they lived in Australia and London for such mail as:
 

 a. One Child Matters, a sponsorship of a child (in both names);
 

 b. Citibank (joint account);
 

 c. Capital One investing (which is an investment account in Joshua's sole name);
 

 d. Citigroup (an account in Joshua's sole name);
 

 e. TD Ameritrade (an account in Joshua's sole name).
 

 22. The North Carolina address served as their headquarters for mail in the United States (although Joshua also received some mail at his parents' address in Virginia and his employer's address in New York.) All of the mail was statements for credit cards and investment accounts, which the Defendant administered online. On one occasion, Mr. Vann did overnight mail that perceived [sic] to be important to the parties in London.
 

 23. The parties lived together in Australia as a married couple from on or about 3 September 2011 until July 2013.
 

 24. In July 2013, the parties relocated to New York as Joshua was recalled by his employer to the New York Office. They lived in New York for approximately two months after which they established a residence in New Jersey.
 

 25. The parties lived in New Jersey from October 2013 until May or June 2014 when Joshua undertook a temporary
 
 *70
 
 work assignment at the law firm's London Office.
 
 *19
 
 26. The parties lived together in London from July 2014 until June 2015.
 

 27. Prior to moving to London, the parties discussed storing items of personal property-much of it marital property but some of it the separate property of Joshua and some of it the separate property of Jessica-in North Carolina while they were to be living in London and they agreed to store the marital and separate property in Fayetteville, North Carolina.
 

 28. Joshua contacted Jesse Vann, Jessica's father to see if he would facilitate the rental of a storage unit in Fayetteville and the receipt of the personal items.
 

 29. On 27 June 2014, Joshua directed a moving company engaged by his employer to wit: Sullivan and Cromwell, to have marital property along with some of his and Jessica's separate property moved from New Jersey to a storage unit in Fayetteville, North Carolina. Joshua intentionally directed marital property to the State of North Carolina.
 

 30. On or about 16 July 2014, Jessica's father, Jesse Vann, rented a storage unit acting under instructions from Joshua Bradley at ExtraSpaceStorage in Fayetteville, North Carolina. Mr. Vann took off a day of work, drove 42 miles to rent the storage unit and signed to receive the property that Joshua had sent to the unit from New Jersey.
 

 31. The unit was rented by Mr. Vann in his own name. By agreement between Joshua and Mr. Vann, Joshua paid the storage unit rental fees and has continued to do so for twenty-three (23) months.
 

 32. Mr. Vann acted as the agent of Joshua in renting the storage unit in North Carolina and receiving the goods on behalf of Joshua. Joshua arranged for Jesse Vann to act in this capacity.
 

 33. The parties learned they were expecting a child in May 2014.
 

 34. A baby shower was held 26 October 2014 in Dublin, North Carolina which Jessica and Joshua both
 
 *20
 
 attended. Both parties also attended a baby shower in ... Virginia.
 

 35. There was one child born of the parties' marriage to wit: EDEN JOEL VANN BRADLEY born 1 February 2015 in London, England.
 

 36. In late May 2015, Joshua suggested, and the parties agreed, that Jessica return to the United States with the baby. The parties flew back to the United States in June with EDEN after which Joshua returned to work in London while Jessica and Eden lived with Joshua's parents in Virginia for approximately one month until relocating to North Carolina.
 

 37. Joshua has been and admits to being in the State of North Carolina on at least the following dates:
 

 a. 25 March 2011 through 29 March 2011
 

 b. 4 May 2011 through 5 May 2011
 

 c. 11 August 2011 through 15 August 2011
 

 d. 3 June 2012 through 15 June 2012
 

 e. 27 November 2013 through 30 November 2013
 

 f. 20 December 2013 through 26 December 2013
 

 g. 17 April 2014 through 21 April 2014
 

 h. 20 June 2014 through 29 June 2014
 

 i. 25 October 2014 through 1 November 2014
 

 38. At no time after the parties were married did the parties live together as husband and wife within the State of North Carolina. The parties never purchased real property within the State of North Carolina. There is no evidence that Joshua ever had a NC [d]river's license or filed taxes in the State.
 

 ....
 

 40. Joshua admits that he "acquiesced to Plaintiff living in North Carolina with the minor child following our separation." However, the Court finds that Joshua did more than acquiesce and actually orchestrated events
 
 *21
 
 which led to Jessica and Eden living in North Carolina in that:
 
 *71
 
 a. He flew back to the United States with Jessica and Eden after discussing living apart for a while and left them at his parents' home in Virginia and returned to London.
 

 b. Jessica began living at his parents' residence in Virginia with EDEN and at her parent's [sic] home in North Carolina with EDEN.
 

 c. At some point, Joshua communicated to Jessica while she was residing with his parents in Virginia and after he had returned to London that their marriage was over.
 

 d. Based on Joshua's actions, it was foreseeable or should have been foreseeable to Joshua that Jessica would return to North Carolina with Eden given his statements to her while she and the minor child were residing with his parents in Virginia.
 

 e. Jessica had no other place to go and Joshua was in London when he broke the news of their separation.
 

 f. It was foreseeable Jessica would return to the State where her parents lived, where she grew up, graduated high school and went to undergraduate college.
 

 g. Jessica went to North Carolina with Joshua's knowledge and with no objection from him.
 

 h. Therefore, Jessica and the minor child, EDEN, resides [sic] in this State as a result of the acts or directives of Joshua.
 

 ....
 

 43. Joshua engaged in purposeful conduct which directed his activities through the State of North Carolina.
 

 44. [Joshua] has filed an Affidavit wherein he admits that North Carolina is the "home state" of the minor child, EDEN, and that North Carolina has jurisdiction
 
 *22
 
 over the claim of custody of the minor child under the Uniform Child Custody Jurisdiction Enforcement Act (UCCJEA).
 

 45. It would be inconvenient for the parties to litigate this matter elsewhere in that:
 

 a. Child Custody must be litigated in North Carolina as North Carolina is the "home state" under the UCCJEA, and the only state with jurisdiction over Eden's Custody.
 

 b. Joshua must appear and defend the child custody action in North Carolina if he wishes to present evidence on the child custody issue.
 

 c. It is therefore reasonable to expect him to travel here and to litigate custody here.
 

 d. It is illogical and inconvenient for the parties to litigate child custody here and the remaining claims in New Jersey even if New Jersey determines it has personal jurisdiction over Jessica.
 

 e. It is convenient for the parties to litigate the matter in North Carolina.
 

 f. Joshua resides in London and must engage in International travel to litigate this matter in New Jersey or North Carolina. There is little difference in the travel options and cost for him in this regard.
 

 g. Jessica resides in North Carolina.
 

 h. If this Court granted Defendant's motion, it would require litigation in two states and the parties to have two lawyers in two states. That is inconvenient and is one factor that must be considered.
 

 46. All of Joshua's actions taken together which have been directed toward North Carolina along with his time in the State, his marriage twice in the State, the use of North Carolina as a "home base," sending marital property to be stored, maintained and kept even to this day in North Carolina and his orchestration of events which led to Jessica and Eden being in
 
 *23
 
 the State of North Carolina are facts upon which this Court considers highly relevant.
 

 47. [Joshua] does not contest that North Carolina is the "home state" under the UCCJEA for the minor child, EDEN, nor does he contest that North Carolina has authority to determine the issue of
 
 *72
 
 child custody regardless of whether it has
 
 in personam
 
 jurisdiction over him.
 

 Based on these findings of fact, the trial court made the following conclusions of law:
 

 1. The Court has jurisdiction over the parties to this action, the minor child whose custody is involved in this action, and over the subject matter of this action.
 

 2. North Carolina is the "home state" of the minor child, EDEN, as that term is defined by N.C.G.S. 50A-201 (a)(l) and [it] is appropriate for this Court to assume jurisdiction over this matter for the purposes of making an initial child custody determination.
 

 3. The Court should assume, and does assume continuing jurisdiction over the child support matters raised in this proceeding in conformity with the Uniform Interstate Family Support Act (UIFSA) codified at N.C. Gen. Stat. § 52C
 
 et. seq.
 

 4. Personal jurisdiction over the Defendant is not required to address child custody.
 

 5. Statutory authority for the exercise of personal jurisdiction over the non-resident Defendant exists under North Carolina's "long arm statute" as codified under
 
 N.C. Gen. Stat. § 1-75.4
 
 (12).
 

 6. The Defendant has had reasonable notice of the claims filed in North Carolina as he was properly served with same.
 

 7. The Defendant has purposefully availed himself of conducting activities within the State of North Carolina thus invoking the benefits and protections of its laws.
 

 *24
 
 8. The Defendant "should reasonably" anticipate being haled into court[ ] in North Carolina as a result of his relationship with the State of North Carolina.
 

 9. It is highly relevant that the Defendant directed marital property to be sent to the State of North Carolina and stored here. If Joshua's items and marital property had been damaged or destroyed in the storage unit in Fayetteville, North Carolina, he would have a cause of action in the State of North Carolina. Likewise, if he neglected to pay the rental fee he could reasonably be expected to be haled into Court in North Carolina (at least through an interpleader action).
 

 10. The Defendant has sufficient contacts with the State of North Carolina to warrant assertion of personal jurisdiction over him such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.
 

 11. The quality and the nature of Defendant's contacts with the forum state make it such that it is reasonable and fair to require him to conduct his defense in the State of North Carolina.
 

 12. Exercise of personal jurisdiction over the non-resident Defendant complies with the due process requirements of the Fourteenth Amendment of the U.S. Constitution.
 

 The overwhelming majority of the above-quoted findings of fact are not challenged by Joshua, and those unchallenged findings are therefore binding on appeal.
 
 See
 

 Koufman v. Koufman
 
 ,
 
 330 N.C. 93
 
 , 97,
 
 408 S.E.2d 729
 
 , 731 (1991) ("Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal.").
 
 [3]
 

 Having thoroughly reviewed the trial court's findings of fact, the record, and the relevant case law, we agree with Jessica that
 
 Sherlock
 
 is the most analogous case to the present action. Here, as in
 
 Sherlock
 
 , the couple lacked a permanent residence during their marriage. Instead,
 
 *25
 
 Joshua and Jessica lived in various locations (both within and outside the United States) as dictated by Joshua's employer. Specifically, during the four years of their marriage, the parties spent the majority of the time living abroad in London and Australia but also lived in
 
 *73
 
 New Jersey for nine months and in New York for two months.
 

 Thus, the facts of the present case clearly demonstrate that this is not the "ordinary divorce case[.]"
 
 Sherlock,
 

 143 N.C. App. at 306
 
 ,
 
 545 S.E.2d at 762
 
 . As in
 
 Sherlock
 
 , the parties' "history is unusual; their frequent moves from one foreign country to another, and their failure to establish a permanent home anywhere in the United States or abroad, require this Court to evaluate their situation on its own merits."
 

 Id.
 

 In considering the factors relevant to the personal jurisdiction analysis, we first take note of the fact that Joshua and Jessica were married in North Carolina, participating in two separate wedding ceremonies. While Joshua is correct that "marriage by itself cannot support a ... court's exercise of [personal] jurisdiction over a spouse[,]"
 
 Kulko
 
 ,
 
 436 U.S. at 93
 
 ,
 
 98 S.Ct. 1690
 
 at 1697,
 
 56 L.Ed.2d at 142
 
 , the wedding ceremonies may properly be considered in conjunction with Joshua's other contacts with North Carolina. We also note that a baby shower for the parties was held in North Carolina to celebrate Jessica's pregnancy.
 

 Second, the trial court found as fact that the parties stored various items of property-including marital property-in North Carolina. We deem significant the fact that not only did Joshua consent to storing the property in this state but, in addition, he (1) personally made several of the necessary arrangements for the storage; and (2) continued to pay rental fees for the storage of the property for the 23-month period preceding the hearing in the trial court. Although he could have instead elected to store the property in New Jersey (where he and Jessica had lived for nine months), in Virginia (where his parents resided), or in some other location, Joshua affirmatively chose to do so in North Carolina.
 
 [4]
 

 Joshua argues that the rental contract for the storage unit was in Mr. Vann's name rather than in Joshua's own name. However, this distinction does not change the fact that it was
 
 Joshua
 
 who affirmatively chose to store his and Jessica's property in North Carolina and continued to do so for almost two full years. In so doing, he has sought to avail himself of "the benefits, protections and privileges of the laws of this State."
 
 See
 

 Miller
 
 , 313 N.C. at 480-81,
 
 329 S.E.2d at 667
 
 .
 

 *26
 
 Third, Joshua chose to have at least some portion of his mail directed to the Vanns' Bladen County mailing address. While he attempts to downplay the significance of this factor by arguing that the mail was "unimportant," the point remains that-once again-he voluntarily chose North Carolina for this purpose.
 

 Finally, while we recognize that the purpose of the due process analysis is to protect the
 
 defendant's
 
 due process rights, our case law nevertheless requires that we also take into account as secondary factors the interest of the forum state and the convenience of the parties.
 
 See
 

 B.F. Goodrich Co. v. Tire King of Greensboro, Inc.
 
 ,
 
 80 N.C. App. 129
 
 , 132,
 
 341 S.E.2d 65
 
 , 67 (1986) (citation omitted) (considering "[t]wo secondary factors, interest of the forum state and convenience to the parties" in applying minimum contacts analysis).
 

 North Carolina has a recognized interest in this action in that the parties were married in this state and Jessica and Eden are both residents of North Carolina.
 
 See
 

 Miller
 
 , 313 N.C. at 480,
 
 329 S.E.2d at 667
 
 ("We are ... mindful that North Carolina has an important interest in ensuring that non-resident parents fulfill their support obligations to their children living here.");
 
 Butler
 
 ,
 
 152 N.C. App. at 82
 
 ,
 
 566 S.E.2d at 712
 
 ("... North Carolina has an important interest in the resolution of plaintiff's claims in the instant action, since plaintiff and the parties' daughter currently reside in this State.").
 

 Similarly, although the convenience of a forum alone cannot confer personal jurisdiction over a non-resident defendant,
 
 Miller
 
 , 313 N.C. at 480,
 
 329 S.E.2d at 667
 
 (citation omitted), we cannot ignore the fact that North Carolina is clearly the most convenient
 
 *74
 
 forum for this action. It is undisputed that the child custody litigation will be handled in North Carolina and that Joshua will likely be required to travel to the state in connection with that proceeding. If Jessica were required to file the present action in a separate jurisdiction, the parties would then have to simultaneously litigate two lawsuits in two separate states-both arising from the parties' marriage. Furthermore, the portion of the couple's marital property currently located in the North Carolina storage unit will presumably be among the items of property distributed in the equitable distribution proceeding.
 

 We recognize that the contacts of the
 
 Sherlock
 
 defendant with North Carolina were more extensive than Joshua's contacts with this state in the present case. However, we reject Joshua's argument that the facts of
 
 Sherlock
 
 constitute a "floor" for purposes of establishing sufficient minimum contacts in this context. To the contrary, this Court expressly
 
 *27
 
 stated in
 
 Sherlock
 
 that "[t]he quantity and quality of defendant's contacts with North Carolina
 
 far exceed
 
 the 'minimum contacts' required for jurisdiction...."
 
 Sherlock
 
 ,
 
 143 N.C. App. at 306
 
 ,
 
 545 S.E.2d at 762
 
 (emphasis added).
 

 In sum, based on our consideration of the relevant factors, we are satisfied that Joshua has sufficient minimum contacts with North Carolina such that the exercise of personal jurisdiction over him would not offend "traditional notions of fair play and substantial justice."
 
 Id.
 
 at 302,
 
 545 S.E.2d at 760
 
 (citation and quotation marks omitted). Thus, we hold that the trial court possessed personal jurisdiction over Joshua.
 

 Conclusion
 

 For the reasons stated above, we affirm the trial court's 13 July 2016 order.
 

 AFFIRMED.
 

 Judges HUNTER, JR. and MURPHY concur.
 

 [1]
 

 Joshua does not contest the fact that the trial court possesses jurisdiction with respect to the parties' child custody dispute. "The jurisdiction of the courts of this State to make child custody determinations is controlled by N.C. Gen. Stat. Sec. 50A-3...."
 
 Hart v. Hart
 
 ,
 
 74 N.C. App. 1
 
 , 5-6,
 
 327 S.E.2d 631
 
 , 635 (1985). "Personal jurisdiction over the nonresident parent is not a requirement under the [statute]."
 
 Id.
 
 at 7,
 
 327 S.E.2d at 635
 
 .
 

 [2]
 

 Joshua does not dispute that North Carolina's long-arm statute permits the exercise of jurisdiction over him by a North Carolina court.
 
 See
 

 N.C. Gen. Stat. § 1-75.4
 
 (2015).
 

 [3]
 

 While Joshua challenges portions of Finding Nos. 32 and 40, he is only challenging them to the extent that they contain the trial court's determination that (1) Mr. Vann acted as Joshua's "agent[;]" and (2) Joshua "orchestrated" Jessica's move to North Carolina following their separation.
 

 [4]
 

 While the trial court did not make a finding as to the specific amount of property the couple stored in North Carolina, evidence was presented at the hearing that the storage rental unit contains a net weight of 2,552 pounds of personal property.